Slip Op. 17-93

## UNITED STATES COURT OF INTERNATIONAL TRADE

ITG VOMA CORPORATION,

      Plaintiff,

and

CHINA RUBBER INDUSTRY ASSOCIATION
and SUB-COMMITTEE OF TIRE
PRODUCERS OF THE CHINA CHAMBER
OF COMMERCE OF METALS, MINERALS
& CHEMICAL IMPORTERS,

      Consolidated Plaintiffs,

v.

UNITED STATES INTERNATIONAL TRADE
COMMISSION,

      Defendant,

and

UNITED STEEL, PAPER AND FORESTRY,
RUBBER, MANUFACTURING, ENERGY,
ALLIED INDUSTRIAL AND SERVICE
WORKERS INTERNATIONAL UNION, AFL-
CIO-CLC,

      Defendant-Intervenor.

Before: Jennifer Choe-Groves, Judge

Consol. Court No. 15-00255

PUBLIC VERSION

## OPINION

[Sustaining the U.S. International Trade Commission's final affirmative material injury
determination in the antidumping and countervailing duty investigations of certain passenger
vehicle and light truck tires from the People's Republic of China.]

Dated:  July 28, 2017

Jonathan Thomas Stoel, Hogan Lovells US LLP, of Washington, DC, argued for Plaintiff ITG Voma Corporation.  With him on the brief were Craig Anderson Lewis and Sean-Michael Lawrence Carlesimo.

Ned Herman Marshak, Grunfeld Desiderio Lebowitz Silverman & Klestadt, LLP, of Washington, DC and New York, NY, argued for Consolidated Plaintiffs China Rubber Industry Association and Sub-Committee of Tire Producers of the China Chamber of Commerce of Metals, Minerals & Chemical Importers.  With him on the brief were Bruce M. Mitchell, Andrew Thomas Schutz, and Max F. Schutzman.

Courtney Sheehan McNamara, Attorney Advisor, Office of the General Counsel, U.S. International Trade Commission, of Washington DC, argued for Defendant United States.  With her on the brief were Dominic L. Bianchi, General Counsel, and Andrea C. Casson, Assistant General Counsel for Litigation.

Elizabeth Jackson Drake, Stewart and Stewart, of Washington, DC, argued for Defendant-Intervenor United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union, AFL-CIO-CLC.  With her on the brief were Philip Andrew Butler and Terence Patrick Stewart.


        Choe-Groves, Judge:  This consolidated action involves passenger vehicle and light truck

("PVLT") tires.  PVLT tires are new pneumatic tires made of rubber, with a passenger vehicle or

light truck designation.  Tires covered by this case include tube-type, tubeless, radial, or non-

radial tires that are intended for sale to original equipment manufacturers or the replacement

market.  See Majority and Dissenting Views at 6, CD 440, Doc. No. 562493 (Aug. 5, 2015)

("Commission Views").  The matter before the court challenges the final material injury

determination of the U.S. International Trade Commission ("Defendant," "ITC," or

"Commission") in the antidumping and countervailing duty investigations of certain passenger

vehicle and light truck ("PVLT") tires from the People's Republic of China ("China").  See

Certain Passenger Vehicle and Light Truck Tires From China, 80 Fed. Reg. 47,000, 47,000 (Int'l

Trade Comm'n Aug. 6, 2015); see also Certain Passenger Vehicle and Light Truck Tires From

<u>China</u>, USITC Pub. 4545 at 1–45, Inv. Nos. 701-TA-522 and 731-TA-1258 (Aug. 2015),

<u>available at</u> https://www.usitc.gov/publications/701_731/pub4545.pdf (last visited July 10, 2017)

("USITC Pub. 4545"); Commission Views at 3–67.

      Before the court are Rule 56.2 motions for judgment on the agency record filed by

Plaintiff ITG Voma Corporation ("ITG Voma") and Consolidated Plaintiffs China Rubber

Industry Association and the Sub-Committee of Tire Producers of the China Chamber of

Commerce of Metals, Minerals & Chemical Importers (collectively, "CRIA").  <u>See</u> Pl.'s Rule

56.2 Mot. J. Agency R., Feb. 16, 2016, ECF No. 37; Pls. Rule 56.2 Mot. J. Agency R., Feb. 16,

2016, ECF No. 38.  ITG Voma and CRIA contend that the Commission's final determination

that imports of PVLT tires from China have materially injured the U.S. PVLT tire industry was

unsupported by substantial evidence and not in accordance with the law.  <u>See</u> Pl. ITG Voma's

Mem. P. & A. in Supp. Rule 56.2 Mot. J. Agency R., Feb. 16, 2016, ECF No. 37-1 ("ITG Voma

Rule 56.2 Br."); Br. in Supp. Pls. Rule 56.2 Mot. J. Agency R., Feb. 16, 2016, ECF No. 38

("CRIA Rule 56.2 Br.").

      The ITC and the United Steel, Paper and Forestry, Rubber, Manufacturing, Energy,

Allied Industrial and Service Workers International Union AFL-CIO, CLC ("USW" or

"Defendant-Intervenor") oppose the Rule 56.2 motions and request that the court sustain the

Commission's final determination.  <u>See</u> Def. Int'l Trade Comm'n's Opp'n Pls.' Mots. J. Agency

R., May 2, 2016, ECF No. 51 ("Def. Resp. Br."); Def.-Intervenor United Steel, Paper and

Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International

Union AFL-CIO, CLC's Opp'n Pls.' Mots. J. Agency R., June 2, 2016, ECF No. 57.

For the reasons set forth below, the court sustains the Commission's final determination and denies the motions for judgment on the agency record.

## BACKGROUND

USW filed antidumping and countervailing duty petitions with the ITC and the U.S. Department of Commerce ("Commerce") on June 3, 2014, alleging that the domestic industry had been materially injured or threatened with material injury from imports of Chinese PVLT tires that benefitted from countervailable subsidies and were sold at less than fair value.  See Staff Report Investigation Nos. 701-TA-522 and 731-TA-1258 (Final) at I-1, CD 429, Doc. No. 560025 (July 2, 2015) ("Staff Report").  The ITC and Commerce instituted antidumping and countervailing duty investigations.[1]  See Certain Passenger Vehicle and Light Truck Tires From China, 79 Fed. Reg. 32,994 (Int'l Trade Comm'n June 9, 2014) (institution of antidumping and countervailing duty investigations and scheduling of preliminary phase investigations); Certain Passenger Vehicle and Light Truck Tires From the People's Republic of China, 79 Fed. Reg.

---

[1] Prior to the commencement of the antidumping and countervailing duty investigations at issue in this case, USW filed a petition with the ITC requesting a safeguard investigation of PVLT tires from China pursuant to section 421 of the Trade Act of 1974.  See Certain Passenger Vehicle and Light Truck Tires From China, 74 Fed. Reg. 19,593 (Int'l Trade Comm'n Apr. 29, 2009) (institution and scheduling of a hearing).  The Commission determined that PVLT tires were being imported between 2004 and 2008 from China into the United States in such increased quantities or under such conditions as to cause or threaten to cause market disruption, and recommended that the President impose additional duties on imports of PVLT tires from China for a three-year period.  See Certain Passenger Vehicle and Light Truck Tires From the People's Republic of China, 74 Fed. Reg. 34,363 (Int'l Trade Comm'n July 15, 2009).  The President provided the domestic industry with import relief from Chinese PVLT tires by imposing additional duties on imports for a period of three years in the amount of 35 percent *ad valorem* in the first year, 30 percent *ad valorem* in the second year, and 25 percent *ad valorem* in the third year, effective September 26, 2009.  See Proclamation No. 8414, 74 Fed. Reg. 47,861 (Sept. 14, 2009).  The section 421 safeguard measures expired on September 26, 2012 and were not renewed.

42,285 (Dep't Commerce July 21, 2014) (initiation of countervailing duty investigation); Certain

Passenger Vehicle and Light Truck Tires From the People's Republic of China, 79 Fed. Reg.

42,292 (Dep't Commerce July 21, 2014) (initiation of antidumping duty investigation).

Commerce completed its antidumping and countervailing duty investigations in June

2015. See Antidumping Duty Investigation of Certain Passenger Vehicle and Light Truck Tires

From the People's Republic of China, 80 Fed. Reg. 34,893 (Dep't Commerce June 18, 2015)

(final determination of sales at less than fair value) ("AD Final Determination"); Countervailing

Duty Investigation of Certain Passenger Vehicle and Light Truck Tires From the People's

Republic of China, 80 Fed. Reg. 34,888 (Dep't Commerce June 18, 2015) (final affirmative

determination) ("CVD Final Determination"). Commerce found that the subject PVLT tires

were being, or were likely to be, sold at less than fair value and calculated final dumping margins

ranging from 14.35 percent to 87.99 percent. See AD Final Determination, 80 Fed. Reg. at

34,893–96. Commerce also found that producers and exporters of PVLT tires from China were

being provided with countervailable subsidies and calculated final countervailing duty rates

ranging from 20.73 percent to 100.77 percent. See CVD Final Determination, 80 Fed. Reg. at

34,888–89.

The ITC published its final material injury determination in August 2015 after

completing its investigation. See Certain Passenger Vehicle and Light Truck Tires From China,

80 Fed. Reg. at 47,000. The period of investigation spanned January 1, 2012 through December

31, 2014. See Commission Views at 4. Based on the information obtained during the

investigation,[2] an evenly divided Commission determined that an industry in the United States

had been materially injured by reason of imports of PVLT tires from China that Commerce

found to be sold at less than fair value and subsidized by the government of China.[3]  See Certain

Passenger Vehicle and Light Truck Tires From China, 80 Fed. Reg. at 47,000; USITC Pub. 4545

at 1–45; Commission Views 3–67.

        The ITC began its injury analysis by defining the domestic product that is like or most

similar to the imported PVLT tires and then identifying the industry responsible for producing

the domestic like-product.  See Commission Views at 5–20.  PVLT tires range from 13 to 26

inches in diameter and are designed for use on standard-type passenger cars, sport utility

vehicles, multipurpose passenger vehicles, or light trucks.  See id. at 8 (citing Staff Report at

---

[2] The ITC obtained information regarding the domestic industry from questionnaire responses
submitted by nine U.S. producers of PVLT tires, which accounted for all known domestic
production of PVLT tires during the period of investigation.  See Commission Views at 4 (citing
Staff Report at I-1).  Thirty-seven companies submitted Import data in questionnaire responses,
which collectively accounted for [[      ]] percent of imported PVLT tires from China and
[[      ]] percent of all imports of PVLT tires during the final year in the period of investigation.
See id. at 4 (citing Staff Report at IV-1).  The Commission also collected data from questionnaire
responses submitted by 48 foreign exporters and producers whose production accounted for
[[      ]] percent of total PVLT tire production in China and whose exports accounted for [[      ]]
percent of PVLT tires imported from China during 2014.  See id. at 4–5 (citing Staff Report at
VII-5).  The ITC held a public hearing on June 9, 2015, see Staff Report at I-1, and received pre-
and post-hearing briefs from importers, purchasers, and producers of PVLT tires who
participated in the investigation.  See Commission Views at 4.

[3] Vice Chairman Dean A. Pinkert and Commissioners Irving A. Williamson and Rhonda K.
Schmidtlein voted in the affirmative determining that the domestic PVLT tire industry was
materially injured by reason of subject imports, while Chairman Meredith M. Broadbent and
Commissioners David S. Johanson and F. Scott Kieff voted in the negative.  See Commission
Views at 3 n.1.  By statute, "[i]f the Commissioners voting on a determination by the
Commission . . . are evenly divided as to whether the determination should be affirmative or
negative, the Commission shall be deemed to have made an affirmative determination."  19
U.S.C. § 1677(11) (2015); see also Gerald Metals, Inc. v. United States, 132 F.3d 716, 718 (Fed.
Cir. 1997).

I-16–I-17).  The Commission's definition of the domestic like-product was coterminous with the

scope of the imported PVLT tires subject to the investigations, which was described by

Commerce as "new pneumatic tires, of rubber, with a passenger vehicle or light truck size

designation" that "may be tube-type, tubeless, radial, or non-radial, and they may be intended for

sale to original equipment manufacturers [("OEM")] or the replacement market."[4]  Id. at 6–11.

Three Commissioners found that the domestic industry included all nine U.S. producers of PVLT

tires, and the remaining three Commissioners found that the domestic industry included eight of

the nine U.S. producers.[5]  See id. at 11–20.

       The Commission assessed the conditions of the U.S. PVLT tire market in its material

injury analysis.  See id. at 20–35.  The Commission observed that domestic consumption of

PVLT tires increased from 274.3 million tires in 2012 to 301 million tires in 2014, an overall

increase of 9.7 percent during the period of investigation.  See id. at 20–21 n.89 (citing Staff

Report at Table IV-6).  Demand for PVLT tires, particularly for higher-value and larger-diameter

PVLT tires, increased due to "a rebounding economy, an increase in the number of miles driven

---

[4] Expressly excluded from the investigations were (1) racing car tires, (2) certain tire sizes, (3) tires that are not new, including recycled and retreaded tires, (4) non-pneumatic tires, (5) tires designed and marketed exclusively as temporary spare tires, (6) tires designed and marketed exclusively for specialty use, and (7) tires designed and marketed exclusively for off-road use. See Commission Views at 7 n.15.

[5] The U.S. producers of PVLT tires are Bridgestone, Continental, Cooper, Goodyear, Michelin, Pirelli, Specialty Tires, Toyo, and Yokohama.  See Commission Views at 12.  Vice Chairman Pinkert and Commissioners Williamson and Schmidtlein found that [[      ]] should be excluded from the domestic industry as a related party because "[[      ]] had a [[         ]] ratio of subject imports to domestic production, indicating that its principal interest is importing rather than domestic production."  Id. at 18–19 n.79.  The three Commissioners noted, however, that including or excluding [[      ]] from the domestic industry would not alter their conclusions regarding material injury.  See id.

as gasoline prices have declined, and an increase in vehicle sales." Id. at 21 (citing Staff Report at II-25, II-28, II-32).  The cost of raw materials used to produce PVLT tires, including natural and synthetic rubber, declined during the period of investigation.[6] See id. at 34–35 (citing Staff Report at V-1–V-2 and Figure V-1).  China provided the largest source of imported PVLT tires and increased its share of the U.S. PVLT market from 11.5 percent in 2012 to 19.3 percent in 2014.  See id. at 23–24 (citing Staff Report at Tables IV-2, IV-3, and IV-6).  The Commission found a moderate to high degree of substitutability between domestically-produced PVLT tires and subject imports.  See id. at 25–27.  The Commission recognized that PVLT tires differ based on brand, quality, and price, but explained that the record did not warrant finding clear dividing lines among categories of tires in the market.  See id. at 27–34.  Based on its assessment of the market, the Commission concluded that subject imports competed in a meaningful way with domestically-produced PVLT tires and that the competition was based primarily on price.  See id. at 33–34.

The Commission then considered the volume of subject imports, the effect subject imports had on the price of domestically-produced PVLT tires, and the impact subject imports had on the domestic industry.  See id. at 35–60.  The ITC found that the volume and increase in volume of imports from China were significant.  See id. at 41–45.  Subject imports significantly

---

[6] During the period of investigation, (1) the cost of ribbed smoked sheets declined by 58 percent, (2) the cost of technically specified rubber (a general purpose natural rubber) declined by 59.4 percent, (3) the cost of styrene butadiene rubber declined by 22.2 percent, and (4) spot prices for crude oil declined by 8.3 percent.  See Commission Views at 35 n.169 (citing Staff Report at V-1 and Figure V-1).  The ratio of raw material costs to the total cost to manufacture PVLT tires declined from 56.8 percent in 2012 to 52.6 percent in 2014.  See id. at 34 (citing Staff Report at V-1).

undersold the domestic like product, but the Commission could not determine from the record

evidence whether it was the underselling or the decline in raw material costs that was responsible

for lowering the prices of domestic PVLT tires.  See id. at 45–52.  The ITC also found that

subject imports had a significant adverse impact on the domestic industry.  See id. at 53–58.  The

ITC noted that the domestic industry experienced a decline in U.S. shipments, net sales volumes,

net sales values, production, capacity, and employment during a time of increased demand,

increased consumption, and lower raw material costs.  See id. at 55 (citing Staff Report at Table

C-2).

Although the domestic industry was increasingly profitable during the period of

investigation, see id. at 55 (citing Staff Report at Tables VI-3 and C-2), the Commission

determined that the domestic industry was materially injured by reason of subject imports that

captured market share at the expense of the domestic industry.  See id. at 58–60.  The

Commission found that this market share effect caused the domestic industry to earn lower

revenues than it would have otherwise earned.  See id.  Accordingly, Commerce issued

antidumping and countervailing duty orders on PVLT tires from China.  See Certain Passenger

Vehicle and Light Truck Tires From the People's Republic of China, 80 Fed. Reg. 47,902 (Dep't

Commerce Aug. 10, 2015) (amended final antidumping duty determination and antidumping

duty order; and amended final affirmative countervailing duty determination and countervailing

duty order).

ITG Voma and CRIA subsequently brought this consolidated action to challenge the

ITC's final affirmative material injury determination.

## JURISDICTION AND STANDARD OF REVIEW

The court has jurisdiction pursuant to 28 U.S.C. § 1581(c) (2012)[7] and Section

516A(a)(2)(B)(i) of the Tariff Act of 1930, as amended, 19 U.S.C. § 1516a(a)(2)(B)(i) (2015),[8]

which grant the court authority to review actions contesting the ITC's final injury determination

following an antidumping or countervailing duty investigation.  The court will uphold the ITC's

"determinations, findings, or conclusions" unless they are "unsupported by substantial evidence

on the record, or otherwise not in accordance with law."  19 U.S.C. § 1516a(b)(1)(B)(i); see also

Siemens Energy, Inc. v. United States, 806 F.3d 1367, 1369 (Fed. Cir. 2014).  The possibility of

drawing two inconsistent conclusions from the evidence does not prevent the court from holding

that the Commission's determinations, findings, or conclusions are supported by substantial

evidence.  See Nippon Steel Corp. v. United States, 458 F.3d 1345, 1352 (Fed. Cir. 2006)

(quoting Am. Silicon Techs. v. United States, 261 F.3d 1371, 1376 (Fed. Cir. 2001)); see also

Consolo v. Fed. Mar. Comm'n, 383 U.S. 607, 620 (1966).

## DISCUSSION

I.      **Legal Framework**

The ITC must support an affirmative material injury determination with findings that (1)

"material injury" existed and (2) the material injury was caused "by reason of" the subject

imports.  See Swiff-Train Co. v. United States, 793 F.3d 1355, 1359 (Fed. Cir. 2015) (quoting

Gerald Metals, Inc. v. United States, 132 F.3d 716, 719 (Fed. Cir. 1997)).  Material injury is

---

[7] Further citations to Title 28 of the U.S. Code are to the 2012 edition.

[8] Further citations to the Tariff Act of 1930, as amended, are to the relevant provisions of Title 19 of the U.S. Code, 2015 edition.

defined by statute as harm that "is not inconsequential, immaterial, or unimportant."  19 U.S.C.

§ 1677(7)(A).  To determine whether a domestic industry has been materially injured or

threatened with material injury by reason of unfairly subsidized or less than fair value imports,

the Commission considers:

(I)     the *volume of imports* of the subject merchandise,

(II)    the *effect of imports* of that merchandise *on prices* in the United States for
        domestic like products, and

(III)   the *impact of imports* of such merchandise *on domestic producers* of
        domestic like products, but only in the context of production operations
        within the United States.

19 U.S.C. § 1677(7)(B)(i) (emphases added).  The Commission may "consider such other

economic factors as are relevant to the determination regarding whether there is material injury

by reason of imports."  19 U.S.C. § 1677(7)(B)(ii).  No single factor is dispositive and "the

significance to be assigned to a particular factor is for the ITC to decide."  See S. Rep. No. 96–

249, at 88 (1979), reprinted in 1979 U.S.C.C.A.N. 381, 474.

The statute neither defines the phrase "by reason of," nor provides the ITC with guidance

on how to determine whether the material injury is by reason of subject imports.  The Court of

Appeals for the Federal Circuit has interpreted the "by reason of" statutory language to require

the Commission to consider the volume of subject imports, their price effects, their impact on the

domestic industry, and to establish whether there is a causal connection between the imported

goods and the material injury to the domestic industry.  See Swiff-Train Co., 793 F.3d at 1361;

see also S. Rep. No. 96–249, at 57–58, 74–75 (1979), reprinted in 1979 U.S.C.C.A.N. 381, 443–

44, 460–61.

**II.     The Parties' Challenges to the Commission's Final Material Injury Determination**

ITG Voma and CRIA challenge various aspects of the Commission's final determination. First, ITG Voma asserts that it was denied due process because the Commission conducted its material injury analysis under a statute that was amended by Congress during the course of the investigation without providing ITG Voma with notice and an opportunity to comment.  See ITG Voma Rule 56.2 Br. 7–9, 12–13.  Second, ITG Voma and CRIA challenge the Commission's findings regarding the conditions of competition in the market, contending that competition between imports of PVLT tires from China and the domestic like product was attenuated and was not based primarily on price.  See id. at 34–42; CRIA Rule 56.2 Br. 23–36.  Third, ITG Voma contests the Commission's determination that the volume and increase in volume of subject imports was significant.  See ITG Voma Rule 56.2 Br. 29–34.  Fourth, ITG Voma and CRIA dispute the Commission's determination that subject imports had a significant adverse impact on the domestic industry and caused it material injury.  See id. at 7–11, 14–27, 31–32, 34–44; CRIA Rule 56.2 Br. 6–22, 36–45.

**a.   The Commission's Application of the Trade Preferences Extension Act of 2015**

Congress enacted the Trade Preferences Extension Act of 2015 ("TPEA") on June 29, 2015, during the course of the ITC's investigation in this matter.  See Pub. L. No. 114-27, 129 Stat. 362, 384–85 (2015).  Section 503 of the TPEA amended the statute that governs the Commission's material injury analysis.[9]  See 19 U.S.C. § 1677(7).  The Commission's final

---

[9] In relevant part, the amended statute requires the ITC to evaluate "gross profits, operating profits, net profits, ability to service debt, . . . [and] return on assets" in considering the impact on

(footnote continued)

determination on August 5, 2015 applied the amended version of the statute in its material injury analysis.  See Commission Views at 53 n.245.

ITG Voma argues that it was denied due process because the Commission did not provide ITG Voma with notice or an opportunity to comment before applying the amended statute.  See ITG Voma Rule 56.2 Br. 7–9, 12–13.  ITG Voma requests that the court remand the final determination to allow ITG Voma an opportunity to comment on the application of the amended provisions of the statute.  See id. at 13.  Defendant responds that parties are presumed to know the law and that ITG Voma had an opportunity to comment on the amended statutory provisions. See Def. Resp. Br. 28–30.

"The core of due process is the right to notice and a meaningful opportunity to be heard." LaChance v. Erickson, 522 U.S. 262, 266 (1998) (citing Cleveland Bd. of Ed. v. Loudermill, 470 U.S. 532, 542 (1985)).  "The first inquiry in every due process challenge is whether the plaintiff has been deprived of a protected interest in 'property' or 'liberty.'"  See Int'l Custom Prods., Inc. v. United States, 791 F.3d 1329, 1337 (Fed. Cir. 2015), cert. denied, 136 S. Ct. 2408 (2016) (quoting Am. Mfrs. Mut. Ins. Co. v. Sullivan, 526 U.S. 40, 59 (1999)) (internal quotations omitted).  Only after establishing that the plaintiff has been deprived of a protected interest will the court evaluate whether the afforded procedures comport with due process requirements.  See Am. Mfrs. Mut. Ins. Co., 526 U.S. at 59.

---

the domestic industry.  See 19 U.S.C. § 1677(7)(C)(iii)(I).  The amended statute additionally proscribes the ITC from reaching a negative material injury determination "merely because the [domestic] industry is profitable or because the performance of that industry has recently improved."  19 U.S.C. § 1677(7)(J).

ITG Voma cannot raise a genuine due process claim here because it has not been

deprived of a protected interest.  ITG Voma is an importer that participated in the investigation

and filed suit to challenge the Commission's final determination, which resulted in the

imposition of antidumping and countervailing duties on ITG Voma's imports of PVLT tires from

China.  Neither importing merchandise under an existing duty rate nor engaging in international

trade is a protectable interest under the U.S. Constitution.  See Int'l Custom Prods., Inc., 791

F.3d at 1337; see also Norwegian Nitrogen Prods. Co. v. United States, 288 U.S. 294, 318

(1933); A Classic Time v. United States, 123 F.3d 1475, 1476 (Fed. Cir. 1997); Am. Ass'n of

Exps. & Imps.–Textile & Apparel Grp. v. United States, 751 F.2d 1239, 1250 (Fed. Cir. 1985).

ITG Voma's due process claim lacks a constitutionally protected interest in property or liberty

and thus is without merit.

Notwithstanding the absence of a constitutionally protected interest, ITG Voma argues

that the Commission was required to provide notice before applying the amended statute in its

final determination.  The court disagrees.  An agency is required to apply the law that is in effect

at the time that it issues its final determination, even when a change in legislation occurs during

the administrative proceeding.  See Ziffrin, Inc. v. United States, 318 U.S. 73, 78 (1943); Aaacon

Auto Transp., Inc. v. Interstate Commerce Comm'n, 792 F.2d 1156, 1161 (D.C. Cir. 1986).  An

agency is under no obligation to provide notice of changes in legislation.  See Texaco, Inc. v.

Short, 454 U.S. 516, 535–36 (1982).  The legislative process provides notice to the public.  See

Logan v. Zimmerman Brush Co., 455 U.S. 422, 433 (1982) (citing Bi-Metallic Inv. Co. v. State

Bd. of Equalization, 239 U.S. 441, 445–46 (1915)).  The Commission was required to make its

final determination in accordance with the amended statute because the TPEA went into effect

during the investigation.[10]  The Commission was not required to provide notice of the

amendments prior to making a final determination.  See Texaco, Inc., 454 U.S. at 535–36; see

also Logan, 455 U.S. at 433 (citing Bi-Metallic Inv. Co., 239 U.S. at 445–46).

ITG Voma asserts that the law required the Commission to provide ITG Voma with an

opportunity to comment on the application of the TPEA before making a final determination.

See ITG Voma Rule 56.2 Br. 12–13 (citing 19 U.S.C. § 1677m(g)).  The Commission is required

by statute to provide parties with an opportunity to comment on all information obtained during

an investigation.  See 19 U.S.C. § 1677m(g).  The statute provides that:

> Information that is submitted on a timely basis to the administering authority or
> the Commission during the course of a proceeding under this subtitle shall be
> subject to comment by other parties to the proceeding within such reasonable time
> as the administering authority or the Commission shall provide.  The
> administering authority and the Commission, before making a final determination
> . . . shall cease collecting information and shall provide the parties with a final
> opportunity to comment on the information obtained by the administering
> authority or the Commission . . . upon which the parties have not previously had
> an opportunity to comment.  Comments containing new factual information shall
> be disregarded.

Id.; see also 19 C.F.R. § 207.30 (regulatory provision implementing statutory mandate).

According to the statute, ITG Voma was entitled to an opportunity to comment on the

information obtained by the Commission during the investigation.

---

[10] Section 503 of the TPEA is silent regarding the effective date for the amendments made to the
Commission's material injury analysis.  The default rule in such a situation is that the effective
date is the date of enactment.  See Gozlon-Peretz v. United States, 498 U.S. 395, 404 (1991) ("It
is well established that, absent a clear direction by Congress to the contrary, a law takes effect on
the date of its enactment."); see also Ad Hoc Shrimp Trade Action Comm., 802 F.3d 1339,
1348–52 (Fed. Cir. 2015) (determining that section 502 of the TPEA applies to determinations
made on or after the date of enactment).  Section 503 of the TPEA thus went into effect on June
29, 2015.  Neither ITG Voma nor CRIA argues that the ITC was required to apply the pre-TPEA
version of 19 U.S.C. § 1677.

The court must determine whether the ITC's application of the amended statute violated its obligation to afford parties an opportunity to comment on information in the record.  Prior to the enactment of the TPEA, the ITC was required to consider the impact on the domestic industry by evaluating the domestic industry's "actual and potential decline in output, sales, market share, profits, productivity, return on investments, and utilization of capacity."  19 U.S.C. § 1677(7)(C)(iii)(I) (2012).  Section 503 of the TPEA amended this statutory provision by (1) substituting "profits" with gross profits, operating profits, and net profits, and (2) additionally requiring the Commission to evaluate the actual and potential decline in the domestic industry's ability to service debt and return on assets.  See Pub. L. No. 114-27, 129 Stat. 362, 384–85 (2015).  Even though the TPEA was enacted shortly before the Commission issued its final determination, the record of the investigation already contained data pertaining to the newly required factors, enabling the Commission to apply the amended statute without the need to obtain additional information.  See Staff Report at VI-21–VI-24, Tables C-1–C-2, VI-1–VI-3; Hearing Transcript at 215, PD 275, document number 558534 (June 10, 2015).  ITG Voma had several opportunities to comment on this record data before the Commission issued its final determination.  See Prehearing Brief of ITG Voma Corporation and American Omni Trading Company, CD 410, document number 558120 (June 2, 2015); Hearing Transcript, PD 275, document number 558534 (June 10, 2015); Post-hearing Brief of ITG Voma Corporation, CD 421, document number 558875 (June 16, 2015); see also 19 C.F.R. § 207.23–25 (providing opportunities to comment during an investigation).  The Commission did not violate its statutory obligation to afford parties an opportunity to comment on information in the record.

ITG Voma argues that the Commission was required to provide an opportunity to comment on the Staff Report.  The Staff Report was issued on July 2, 2015 after the TPEA was enacted and recited the statutory criteria for the Commission's material injury analysis according to the statute prior to the TPEA amendments.  See ITG Voma Rule 56.2 Br. 9, 12.  ITG Voma's argument is unavailing.  Even if the court were to presume that the law recited in the Staff Report constitutes "information" under 19 U.S.C. § 1677m(g), ITG Voma had an opportunity to comment on the Staff Report when it submitted final comments on July 10, 2015.  See Final Comments of ITG Voma Corporation, PD 333, document number 560461 (July 10, 2015).  Counsel for ITG Voma acknowledged during oral argument that ITG Voma "perhaps . . . should have" submitted comments relating to the amended statute.  See Oral Argument at 01:47:12–01:47:20, April 26, 2017, ECF No. 83.  Counsel for ITG Voma also noted during oral argument that the ITC never rejected an attempt to submit comments pertaining to the amended statute.  See id. at 00:12:11–00:12:28.  Significantly, the court notes that Defendant-Intervenor addressed the amended law in its final comments submitted to the ITC.  See Petitioner's Final Comments, CD 437, document number 560455 (July 10, 2015).  The fact that another party in this case submitted comments relating to the amended law underscores the fact that ITG Voma had a meaningful opportunity to comment.  Moreover, ITG Voma has failed to identify any information on the record that was not previously subject to comment during the investigation.  The Commission provided ITG Voma with all the process that was due under 19 U.S.C. § 1677m(g).

The court holds, therefore, that ITG Voma was not deprived of its due process and was otherwise afforded notice and an opportunity to comment.

### b.  The Commission's Assessment of the Conditions of Competition

ITG Voma and CRIA challenge the Commission's assessment of the conditions of

competition in the U.S. PVLT tire market, specifically the Commission's findings that PVLT

tires imported from China competed in a meaningful way with domestically-produced PVLT

tires and that the competition was based primarily on price.  See ITG Voma Rule 56.2 Br. 34–42;

CRIA Rule 56.2 Br. 23–36.  ITG Voma and CRIA assert that the Commission's findings were

unsupported by substantial evidence because the competition between the two products was

attenuated and was based primarily on brand.  See ITG Voma Rule 56.2 Br. 34–42; CRIA Rule

56.2 Br. 23–36.  Defendant argues that the record contained substantial evidence to support its

findings and that ITG Voma and CRIA have failed to demonstrate otherwise.  See Def. Resp. Br.

7–18.

The Commission must "evaluate all relevant economic factors . . . within the context of

the business cycle and conditions of competition that are distinctive to the affected industry"

when considering the impact of subject imports on the domestic industry.  19 U.S.C.

§ 1677(7)(C)(iii).  The statute does not provide further guidance, giving the Commission

discretion to assess the conditions of competition in a particular industry.  The Commission's

findings regarding competition and market conditions must be supported by substantial evidence

in the record.  See Siemens Energy, Inc., 806 F.3d at 1369 (quoting 19 U.S.C.

§ 1516a(b)(1)(B)(i)).

The Commission found that "subject imports from China compete[d] in a meaningful

way with the domestic industry's PVLT tires" and that the competition "depend[ed] primarily on

price."  Commission Views at 33–34.  The Commission supported its conclusions by relying on

**PUBLIC VERSION**

a number of subsidiary findings, including that: (i) the domestic like product consisted of all

PVLT tires; (ii) there was a moderate to high degree of substitutability between the domestic like

product and subject imports; (iii) there was significant overlap in the competition between

domestic producers and importers of subject merchandise; and (iv) price was an important

purchasing factor.  See id. at 9–11, 25–34.  As explained below, these subsidiary findings were

supported by substantial evidence on the record and validated the Commission's conclusions that

the competition between subject imports and domestic tires was meaningful and depended

primarily on price.

First, the Commission defined the domestic like product to consist of all PVLT tires,

despite variations in size and design features.  See id. at 9–11.  The Commission observed that all

PVLT tires are produced from the same basic raw materials,[11] have the same basic components,[12]

and are used for mounting on wheels of passenger vehicles and light trucks.  See id. at 9 (citing

Staff Report at I-17–I-21).  The Commission noted that PVLT tires are generally produced using

common manufacturing facilities, production equipment, production processes, and employees.

See id. at 9–10 (citing Staff Report at I-24–I-30).  These characteristics are common to all PVLT

tires, regardless of whether the tires are produced domestically or in China.  Id. at 11.  The

Commission also noted that "customers and producers view PVLT tires as a single product

category."  Id.

---

[11] PVLT tires are made of "approximately 40 percent rubber (natural and synthetic) by weight, 28 percent carbon black reinforcement, 17 percent reinforcing fabric body ply and other additives, and 15 percent steel (belts and bead wire)."  Staff Report at I-17.

[12] The basic components of PVLT tires include an inner liner, body ply, sidewall beads, belt package, and tread.  See Commission Views at 9 (citing Staff Report I-17–I-21).

Second, the Commission found that there is a moderate to high degree of substitutability between the domestic like product and subject imports.  See id. at 25–27.  Producers in both the United States and China manufacture PVLT tires in "a broad range of sizes, styles, and performance characteristics."  Id. at 25 (citing Staff Report at I-22–I-25, II-32, Tables V-5–V-10).  PVLT tires of the same size can fit the same vehicles and be used interchangeably even if the tires have different style and performance characteristics.  See id. at 11, 25–26; Staff Report at Table II-17 (producers, importers, and purchasers reported that domestic PVLT tires and PVLT tires from China are "always" or "frequently" interchangeable), V-8 n.12 (questionnaire responses provided that different speed ratings do not affect comparability of products).  The Commission also noted that the majority of responding purchasers reported that PVLT tires produced in the United States and in China are "'comparable' in terms of discounts offered, extension of credit, packaging, private label, product consistency, quality both meets and exceeds industry standards, reliability of supply, and U.S. transportation costs."  Id. at 26 (citing Staff Report at II-39, Table II-16).  All PVLT tires sold in the U.S. market must meet certain safety standards and marking requirements set by the National Highway Traffic Safety Administration and the U.S. Department of Transportation.  See Staff Report at II-1.  The record supports the Commission's finding that there was a moderate to high degree of substitutability between subject imports and domestic PVLT tires.

Third, the Commission found that there was significant overlap in the competition between domestic PVLT tires and subject imports.  See Commission Views at 26–30.  Domestic producers and importers of subject merchandise: (1) supplied the market with branded and

private-label tires,[13] (2) had a larger share of shipments that involved branded tires, (3) sold tires in the OEM and replacement segments of the market,[14] (4) directed a larger share of shipments to the replacement segment of the market, and (5) sold PVLT tires in the same geographic regions in the United States.  See id. at 27–30; Staff Report at Tables II-1, II-3, II-5, III-7, IV-7 (tabulating market share by segment, channels of distribution, geographic markets, shipments of branded tires, and shipments of private-label tires).  This record evidence supported the Commission's finding.

Fourth, the Commission found that price was an important purchasing factor.  See Commission Views at 26–27, 34.  The Commission observed that PVLT tires in the market differed based on brand, quality, and price.  See id. at 31–32, 34 (citing Staff Report at II-12 and App. D).  The Commission observed that prices of private-label tires influence what purchasers are willing to pay for branded tires, prices of tires in the replacement segment influence what purchasers are willing to pay for tires in the OEM segment, and prices of lower-category tires influence what purchasers are willing to pay for higher-category tires.  See id. at 49 n.232, 49 n.235, 50 n.236.  Half of the responding U.S. producers and a majority of importers and purchasers reported that differences other than price were "'sometimes' or 'never' important when comparing PVLT tires made in the United States and China."  Id. at 27 (citing Staff Report

---

[13] The Commission defined 'branded' tires as "those produced or packaged for sale under the name of the manufacturer of the tire or a brand name owned by that manufacturer."  Commission Views at 27–28 (citing Staff Report at III-21 n.27).  The Commission defined 'private-label' tires as "those that are produced or packaged for sale under a name other than the manufacturer's name or a brand name owned by that manufacturer."  Id.

[14] PVLT tires in the OEM segment are sold to manufacturers for mounting on new vehicles or trucks, and PVLT tires in the replacement segment are sold to distributors and retailers for replacing existing tires on a vehicle.  See Commission Views at 21 (citing Staff Report at II-1).

at Table II-19).  The Commission reasonably found that price was an important factor for

customers who purchase PVLT tires in the domestic market.

      Each of the above findings was supported by substantial evidence on the record.  The

Commission relied on these findings and reasonably concluded that the competition between

imports of PVLT tires from China and domestically-produced PVLT tires was meaningful and

based primarily on price.  Therefore, the Commission's findings regarding the conditions of

competition were supported by substantial evidence.

      ITG Voma and CRIA maintain, however, that the competition between subject imports

and domestically-produced PVLT tires was "attenuated."  See ITG Voma Rule 56.2 Br. 34–42;

CRIA Rule 56.2 Br. 23–36.  To support their position, ITG Voma and CRIA argue that subject

imports were not competitive with domestic PVLT tires because the PVLT tires sold in the OEM

segment were predominantly domestically-produced or imported from non-subject producers.[15]

See ITG Voma Rule 56.2 Br. 34–37; CRIA Rule 56.2 Br. 23–27.  This argument fails to

persuade the court that the Commission's finding is unsupported by substantial evidence.  ITG

Voma and CRIA would prefer to have the Commission analyze the OEM and replacement

segments of the market independently, but the law imposes no such requirement on the

Commission.  See Far E. Textile Ltd. v. U.S. Int'l Trade Comm'n, 25 CIT 999, 1004 (2001)

(citing Makita Corp. v. United States, 21 CIT 734, 755, 974 F. Supp. 770, 788 (1997)).  ITG

---

[15] Between [[     ]] and [[     ]] percent of the PVLT tires sold in the OEM segment of the
market during the period of investigation were manufactured by domestic producers.  See Staff
Report at Table II-1.  Between [[     ]] and [[     ]] percent were manufactured by non-subject
producers.  See id.  Imports from China were responsible for between [[     ]] and [[     ]] percent
of the PVLT tires sold in the OEM segment.  See id.

Voma and CRIA have not cited to any authority that required the Commission to engage in a

segmented analysis in this investigation.  The Commission elected to analyze the market as a

whole and supported its competition findings with substantial evidence.  The Commission

acknowledged that the vast majority of tires in the OEM segment were supplied by domestic

producers and non-subject imports, but noted that "the replacement segment accounted for a

larger share of the U.S. market . . . than the OEM segment."[16]  See Commission Views at 21, 29

(citing Staff Report at Tables II-1 and II-3).  Even though domestic producers were responsible

for the vast majority of PVLT tires sold in the OEM market, domestic producers' shipments to

OEMs accounted for a modest portion of their total shipments during the period of

investigation.[17]  See Commission Views at 44–45 (citing Staff Report at Table II-3).  Most of the

PVLT tires manufactured by domestic producers were directed to the replacement segment of the

market.[18]  The fact that a substantial proportion of both domestically-produced PVLT tires and

subject imports were sold in the larger replacement segment[19] of the market supports the

---

[16] The replacement segment accounted for approximately [[      ]] percent and the OEM segment
accounted for approximately [[      ]] percent of the U.S. market.  See Commission Views at 21
(citing Staff Report at Table II-3).  The record evidence indicated that the replacement segment
was growing, given that "[t]he average age of U.S. vehicles on the road increased by almost 18
percent over the past decade."  Id. at 21–22 (citing Staff Report at 4).

[17] Shipments to the OEM segment of the market accounted for slightly more than 25 percent of
domestic producers' total U.S. shipments and about 20 percent of domestic producers' total
production.  See Staff Report at Tables II-3 and III-5.

[18] Shipments to the replacement segment of the market accounted for slightly less than 75
percent of domestic producers' total U.S. shipments and about 55 percent of domestic producers'
total production.  See Staff Report at Tables II-3 and III-5.

[19] Shipments to the replacement segment of the market accounted for slightly less than 75
percent of all PVLT tires imported from China.  See Staff Report at Tables II-3 and IV-2.

Commission's conclusion that PVLT tires produced in the United States competed with tires produced in China.

ITG Voma and CRIA argue that the competition between subject imports and domestic tires was attenuated because the U.S. PVLT tire market was divided into distinct categories and subject imports did not compete with higher-category tires. See ITG Voma Rule 56.2 Br. 38–42; CRIA Rule 56.2 Br. 27–36. The argument of ITG Voma and CRIA is unavailing because the Commission reasonably found that the U.S. PVLT tire market was not divided into clear and distinct categories of tires based on brand, quality, and price. See Commission Views at 29–34. A majority of responding U.S. producers reported that the market was not divided into categories. See id. at 31 (citing Staff Report at II-11). Most importers and purchasers reported that the market was divided, but there was wide disagreement regarding the divisions in the market. See id. at 31–33. Aside from some agreement regarding top-tier PVLT tires,[20] the record contained conflicting information regarding the number of categories in the market, the characteristics that differentiated one category from another, where specific brands fell within these alleged categories, and the size of each category. See id. at 31–32 (citing Staff Report at II-11, App. D, Table II-4). The Commission recognized that PVLT tires in the market differed based on brand, quality, and price, but found that the conflicting information in the record did

---

[20] Parties that responded to questionnaires agreed that top-tier PVLT tires possessed the following characteristics: "higher price, better/premium quality, strong and sophisticated marketing and retail programs, brand recognition, mileage warranty, major original equipment manufacturers, and high level of technology." Commission Views at 32 n.154. Responding parties most frequently identified Bridgestone, Continental, Goodyear, Michelin, and Pirelli as suppliers of top-tier tires. See id. at 32 n.155 (citing Staff Report at II-12 and App. D).

not warrant finding clear divisions in the market.[21]  See id. at 34.  The Commission found that

domestic PVLT tires and subject imports competed across product categories, regardless of how

the categories of tires in the market are defined.  See id. (citing Staff Report at App. D).

Substantial evidence in the record supported the Commission's finding that the market was not

divided into clear and distinct categories of tires based on brand, quality, and price.

ITG Voma and CRIA assert that the competition in the U.S. PVLT tire market was based

primarily on brand, rather than price.  See ITG Voma Rule 56.2 Br. 38–42; CRIA Rule 56.2 Br.

27–36.  The Commission recognized that brand influenced the prices that consumers were

willing to pay for PVLT tires because "brand names communicate the quality and performance

of the tire" and "consumers are willing to pay more for the perception of higher quality and

performance levels."  Commission Views at 28 (citing Staff Report at II-34–II-35).  Most

purchasers reported, however, that brand is not an important factor in purchasing PVLT tires.

See id. at 49 n.234 (citing Staff Report at Table II-11).  Some consumers confirmed that they

would pay a higher price for a better brand, but also stated that the importance of brand

diminishes if the price gap is large.[22]  See id.  The Commission also noted that PVLT tires

---

[21] The Commission also noted that it previously confronted this issue and reached the same conclusion in the section 421 investigation that investigated subject imports between 2004 and 2008.  See Commission Views at 30 (citing Certain Passenger Vehicle and Light Truck Tires From China, USITC Pub. 4085 at 21, Inv. No. TA-421-7 (July 2009), available at https://www.usitc.gov/publications/safeguards/pub4085.pdf (last visited July 10, 2017)).

[22] Subject imports undersold domestic tires with sizeable and increasing margins throughout the period of investigation.  See Commission Views at 46.  According to pricing data obtained for six PVLT tire products, the Commission found that "subject imports undersold the domestic like product in 72 of 72 possible quarterly comparisons, or 100 percent of the time, at margins reaching as high as [[     ]] percent and averaging [[     ]] percent."  Id. (citing Staff Report at Tables V-5–V-10).

marked with domestic producers' brand names sometimes were manufactured domestically and

other times were manufactured in China because domestic producers imported PVLT tires from

China.  See id. at 32 n.155, 34 n.164 (citing Staff Report at Tables III-9, E-1, and E-2).  It was

reasonable for the Commission to conclude that the competition in the market was based

primarily on price due to the degree of substitutability among PVLT tires, the overlap in

competition in the market, and the importance of price in purchasing PVLT tires.

The court holds, therefore, that the Commission's findings regarding the conditions of

competition in the U.S. PVLT tire market were supported by substantial evidence.

### c.  The Commission's Volume Determination

ITG Voma argues that the Commission's volume determination was not supported by

substantial evidence because the volume and increase in volume of subject imports from China

were not significant.  See ITG Voma Rule 56.2 Br. 29–34.  Defendant maintains that its volume

determination was supported by substantial evidence.  See Def. Resp. Br. 18–20.

The ITC is required to consider the volume of subject imports in determining whether a

domestic industry has been materially injured.  See 19 U.S.C. § 1677(7)(C)(i).  When evaluating

volume, the Commission must consider "whether the volume of imports of the merchandise, or

any increase in that volume, either in absolute terms or relative to production or consumption in

the United States, is significant."  19 U.S.C. § 1677(7)(C)(i); see also Nucor Corp. v. United

States, 414 F.3d 1331, 1335 (Fed. Cir. 2005).  The statute does not define what is considered

'significant' because, "[f]or one industry, an apparently small volume of imports may have a

significant impact on the market; for another, the same volume might not be significant."  See

S. Rep. No. 96–249, at 88 (1979), reprinted in 1979 U.S.C.C.A.N. 381, 474.  The court will

uphold the Commission's volume determination unless it is unsupported by substantial evidence

in the record.  See Siemens Energy, Inc., 806 F.3d at 1369 (quoting 19 U.S.C.

§ 1516a(b)(1)(B)(i)).

The Commission found that the volume and increase in volume of subject imports from

China was significant in absolute terms and relative to consumption and production in the United

States.  See Commission Views at 41–45.  The volume of subject imports and domestic

consumption increased progressively during the period of investigation,[23] but the volume of

subject imports increased at a much faster rate.[24]  See id. at 41–42 n.194–96 (citing Staff Report

at Tables IV-6 and C-2).  Subject imports benefitted from the increased consumption and nearly

doubled their share of the domestic market,[25] whereas domestic producers experienced an overall

decline in shipments and loss of market share.[26]  See id. at 42 n.197.  Domestic producers and

importers of subject merchandise reported modest increases in shipments in the smaller OEM

---

[23] A total of 31.4 million tires were imported from China in 2012 and 58.0 million tires were imported from China in 2014.  See Commission Views at 41 n.194 (citing Staff Report at Tables IV-6 and C-2).  Domestic consumption increased from 274.3 million tires in 2012 to 301.0 million tires in 2014.  See id. at 41 n.195.

[24] Domestic consumption increased at an overall rate of 9.7 percent during the period of investigation, whereas subject imports increased at an overall rate of 84.3 percent.  See Commission Views at 41–42 n.196 (citing Staff Report at Table C-2).

[25] Subject imports increased their share of the market from 11.5 percent in 2012 to 19.3 percent in 2014, for an overall increase of 7.8 percent.  See Commission Views at 42 n.198 (citing Staff Report at Tables IV-6 and C-2).

[26] Shipments of domestically-produced PVLT tires declined from [[           ]] tires in 2012 to [[           ]] tires in 2014, for an overall decline of [[    ]] percent.  See Commission Views at 42 n.197 (citing Staff Report at Table C-2).  Domestic producers' share of the market declined from [[    ]] percent in 2012 to [[    ]] percent in 2014, for an overall loss of [[    ]] percent.  See id. at 42 n.199 (citing Staff Report at Table C-2).

segment of the market.[27]  See Staff Report at Table II-3.  In the larger replacement segment,

domestic producers' shipments declined by 4 million tires and shipments of subject imports

increased by 17 million tires.  See id.  The replacement segment grew at a rate of 9.1 percent

during the period of investigation and subject imports in that segment increased by 72.7 percent.

See Commission Views at 45 (citing Staff Report at II-7).  The Commission noted that the

increasing presence of subject imports was apparent when considered relative to U.S.

production.[28]  See id. at 42 n.198.  The Commission also noted that non-subject imports' share of

the market declined during the period of investigation.[29]  See id. at 42 n.199, 44 n.208.  The

increase in volume of subject imports amounted to substantial evidence in the record that

supported the Commission's conclusion.

         ITG Voma argues, however, that the Commission failed to explain why the volume of

subject imports was significant in light of the domestic industry's strong financial performance

and capacity constraints.  See ITG Voma Rule 56.2 Br. 29–33.  The statute requires the

Commission to determine "whether the volume of imports of the merchandise, or any increase in

that volume, either in absolute terms or relative to production or consumption in the United

States, is significant."  19 U.S.C. § 1677(7)(C)(i).  ITG Voma's argument presumes incorrectly

that the Commission is required by law to consider the domestic industry's condition and

---

[27] Domestic producers increased shipments by 800,000 tires and importers of subject
merchandise increased shipments by 27,000 tires.  See Staff Report at Table II-3.

[28] "The ratio of subject imports to domestic production was [[     ]] percent in 2012, [[     ]]
percent in 2013, and [[     ]] percent in 2014."  See Commission Views at 42 n.198 (citing Staff
Report at Table C-2).

[29] The volume of PVLT tires imported from non-subject countries increased slightly, but the
share of non-subject imports in the market fell from 41.9 percent in 2012 to 38.8 percent in 2014.
See Commission Views at 42 n.199, 44 n.208 (citing Staff Report at Tables II-3 and C-2).

financial performance in its volume analysis.  Rather, the Commission must consider the

domestic industry's condition and financial performance when analyzing whether subject

imports adversely impacted the domestic industry.  See 19 U.S.C. § 1677(7)(C)(iii).  The court

will not "ask more of the Commission than required by the statute."  Altx, Inc. v. United States,

370 F.3d 1108, 1123 (Fed. Cir. 2004).

The court holds that the Commission's volume determination was supported by

substantial evidence.

### d.  The Commission's Impact Determination

ITG Voma and CRIA challenge the Commission's impact determination as unsupported

by substantial evidence.  See ITG Voma Rule 56.2 Br. 7–11, 14–27; CRIA Rule 56.2 Br. 6–22,

44–45.  They argue that the Commission failed to consider a number of the statutory impact

factors and failed to address detracting evidence in the record regarding the domestic industry's

overall health and strong financial performance throughout the period of investigation.  See ITG

Voma Rule 56.2 Br. 9–10, 14–34; CRIA Rule 56.2 Br. 7 n.2, 10–22, 44–45.  Defendant contends

that its impact determination was supported by substantial evidence.  See Def. Resp. Br. 20, 24–

43.

As part of the material injury analysis, the Commission must consider "the impact of

[subject imports] on domestic producers of domestic like products, but only in the context of

production operations within the United States."  19 U.S.C. § 1677(7)(B)(i)(III).  The statute

specifies a number of factors that are relevant in determining whether subject imports have had

an adverse impact on domestic producers:

(I)     actual and potential decline in output, sales, market share, gross profits, operating profits, net profits, ability to service debt, productivity, return on investments, return on assets, and utilization of capacity,

(II)    factors affecting domestic prices,

(III)   actual and potential negative effects on cash flow, inventories, employment, wages, growth, ability to raise capital, and investment,

(IV)    actual and potential negative effects on the existing development and production efforts of the domestic industry, including efforts to develop a derivative or more advanced version of the domestic like product, and

(V)     in a proceeding under part II of this subtitle, the magnitude of the margin of dumping.

19 U.S.C. § 1677(7)(C)(iii).  The Commission is directed to "evaluate all relevant economic factors . . . within the context of the business cycle and conditions of competition that are distinctive to the affected industry."  19 U.S.C. § 1677(7)(C)(iii).  No single factor is dispositive and "the significance to be assigned to a particular factor is for the ITC to decide."  See S. Rep. No. 96–249, at 88 (1979), reprinted in 1979 U.S.C.C.A.N. 381, 474.

Here, the Commission determined that subject imports had a significant adverse impact on the domestic industry.  See Commission Views at 53–58.  The Commission acknowledged that the domestic industry was increasingly profitable during the period of investigation due to increasing domestic consumption and declining raw material costs.  See id. at 55.  Operating income, gross profits, and net income all increased for the domestic industry.[30]  See id. at 55 n.250.  The Commission explained, however, that this strong financial performance did not accurately represent the state of the domestic industry.  Domestic producers experienced an

---

[30] Operating income increased from $[[          ]] in 2012 to $[[          ]] in 2014, gross profits increased from [[     ]] percent in 2012 to [[     ]] percent in 2014, and net income increased from $[[          ]] in 2012 to $[[          ]] in 2014.  See Commission Views at 55 n.250 (citing Staff Report at Table C-2).

overall decline in domestic shipments, net sales volume, net sales value, production, employment, and productivity.[31]  See id. at 55 (citing Staff Report at Table C-2).  The U.S. PVLT market was growing, but the domestic industry's stagnation resulted in a loss of market share.[32]  See id.  Domestic producers made sizeable expenditures for capital improvements, research, and development in order to keep up with the increasing demand, expand capacity, and upgrade equipment; but these expenditures were to no avail, as production capacity declined overall by the end of the period of investigation.[33]  See id. at 56.  Even with the decline in production capacity, the Commission found that the domestic industry was not operating at full capacity and thus was capable of supplying the additional demand and consumption of PVLT

---

[31] U.S. shipments declined from [[          ]] tires in 2012 to [[          ]] tires in 2014. See Commission Views at 55 n.252 (citing Staff Report at Table C-2).  Net sales volume was [[          ]] tires in 2012 and [[          ]] tires in 2014.  See id. at 55 n.253 (citing Staff Report at Table C-2).  Net sales value was $[[          ]] in 2012 and $[[          ]] in 2014.  See id. at 55 n.254 (citing Staff Report at Table C-2).  Domestic production declined from [[          ]] tires in 2012 to [[          ]] tires in 2014.  See id. at 55 n.255 (citing Staff Report at Table C-2).  Hourly wages for employees increased, but the average number of production and related workers employed declined from [[     ]] in 2012 to [[     ]] in 2014. See id. at 55 n.256 (citing Staff Report at Table C-2).  Productivity was [[     ]] PVLT tires per hour in 2012 and [[     ]] tires per hour in 2014.  See id.

[32] Domestic consumption of PVLT tires increased at an overall rate of 9.7 percent during the period of investigation.  See Commission Views at 42 n.196 (citing Staff Report at Table C-2). The record indicated that the larger replacement segment of the market was continuing to grow as "[t]he average age of U.S. vehicles on the road increased by almost 18 percent over the past decade." Commission Views at 21–22 (citing Staff Report at II-4).  Despite this growth, the domestic industry's share of the market fell from [[     ]] percent in 2012 to [[     ]] percent in 2014.  See Commission Views at 55 n.257 (citing Staff Report at Table C-2).

[33] The domestic industry incurred a total of over $[[          ]] in capital expenditures and approximately $[[          ]] in research and development expenses during the period of investigation.  See Commission Views at 56 n.259 (citing Staff Report at Tables VI-4 and C-2).

tires.[34]  See id. at 57.  The Commission reasoned that the domestic industry could have obtained

additional revenue by using its available capacity to produce and sell more PVLT tires.  See id.

at 58.  In light of the record evidence, the Commission's determination that subject imports

adversely impacted the domestic industry was reasonable.  The Commission considered the

statutory impact factors, explained its findings, and relied upon substantial evidence in the record

to support the conclusion that the domestic industry was adversely impacted by subject imports.

      ITG Voma and CRIA argue that the Commission's impact analysis was not supported by

substantial evidence because the Commission failed to consider new statutory impact factors

added by the TPEA, specifically the domestic industry's ability to service debt and return on

assets.  See ITG Voma Rule 56.2 Br. 9–11; CRIA Rule 56.2 Br. 7 n.2.  The Commission

considered the impact factors added by the TPEA in making its final determination.  See

Commission Views at 53 n.245.  The statute requires the Commission to consider a number of

factors in assessing the impact on the domestic industry.  See 19 U.S.C. § 1677(7)(C)(iii).  Other

than highlighting the fact that the Commission did not provide a lengthy discussion, ITG Voma

and CRIA have not supplied the court with any reason to believe that the Commission failed to

consider the factors added by the TPEA in making its final determination.  See 28 U.S.C.

§ 2639(a)(1) (providing that injury determinations made by the ITC are presumed to be correct

and the burden of proving otherwise rests upon the challenging party).  Consideration of a factor

does not require an in-depth discussion of that factor and the court will not "ask more of the

Commission than required by the statute."  Altx, Inc., 370 F.3d at 1123.  ITG Voma asserts that

---

[34] The highest capacity utilization rate achieved during the period of investigation was [[      ]]
percent in 2012.  See Commission Views at 57 n.264 (citing Staff Report at Table C-2).

the statute required the Commission to supply a more robust explanation.  See ITG Voma Rule

56.2 Br. 10 (citing 19 U.S.C. § 1677f(i)(3)).  The statutory provision that ITG Voma relies upon,

however, is merely a codification of the Commission's pre-existing requirement to support its

final determination with substantial evidence in the record.  See Timken U.S. Corp. v. United

States, 421 F.3d 1350, 1354–57 (Fed. Cir. 2005).

　　　ITG Voma and CRIA also argue that the Commission failed to address detracting

evidence in the record regarding the domestic industry's strong financial performance during the

period of investigation.  See ITG Voma Rule 56.2 Br. 14–27; CRIA Rule 56.2 Br. 10–15.  To the

extent that ITG Voma and CRIA argue that a profitable industry cannot be materially injured, the

statute expressly proscribes the Commission from reaching such a conclusion.  See 19 U.S.C.

§ 1677(7)(J).[35]  The Commission acknowledged that the domestic industry was increasingly

profitable, but noted that this was "not unexpected during a period of increasing apparent U.S.

consumption and declining raw material costs for natural and synthetic rubber."  Commission

Views at 55.  The Commission reasonably decided to assign greater weight to other factors,

which indicated that the domestic industry was in decline or in a state of stagnation when the

PVLT tire market was growing.  See id. at 55–56; see also S. Rep. No. 96–249, at 88 (1979),

reprinted in 1979 U.S.C.C.A.N. 381, 474 ("[T]he significance to be assigned to a particular

factor is for the ITC to decide.").  According to the Commission's analysis, the domestic industry

could have been even more profitable.

---

[35] "The Commission may not determine that there is no material injury or threat of material
injury to an industry in the United States merely because that industry is profitable or because the
performance of that industry has recently improved."  19 U.S.C. § 1677(7)(J).

CRIA argues that domestic producers shifted production to higher-value and more profitable PVLT tires and ceded their share of the market for lower-value PVLT tires.  See CRIA Rule 56.2 Br. 36–39.  This argument is unavailing because it assumes that higher-value domestically-produced PVLT tires do not compete with subject imports.  As explained above, the Commission found substantial evidence in the record indicating that subject imports competed with PVLT tires across the market, regardless of differences in brand, quality, and price.  See Commission Views at 34 (citing Staff Report at App. D).  Subject imports were competitive with both higher- and lower-value domestic PVLT tires.

ITG Voma and CRIA argue that subject imports did not adversely impact the domestic industry because domestic producers already operated at full capacity during the period of investigation.  See ITG Voma Rule 56.2 Br. 17–22; CRIA Rule 56.2 Br. 15–22.  The Commission addressed this argument in its final determination and cited substantial evidence showing that the domestic industry had available capacity.[36]  The Commission noted that the highest capacity utilization rate experienced during the period of investigation was considerably lower than the utilization rate of 96.3 percent achieved in 2004, which was the first year in the

---

[36] The Commission observed the following regarding the domestic industry's capacity utilization during the period of investigation:

> The domestic industry's capacity utilization declined from [[     ]] percent in 2012 to [[     ]] percent in 2013 when subject imports surged into the U.S. market after the safeguard measure expired, so in 2013 the domestic industry did not operate at the higher level that it had achieved in 2012.  After the petitions in these investigations were filed in June 2014 and the monthly volume of subject imports from China declined between July and December 2014, the domestic industry was able to increase its capacity utilization for full-year 2014 to [[     ]] percent.

Commission Views at 57 (internal footnotes omitted).

period of investigation for the section 421 safeguard proceeding.  See id. at 57 n.266 (citing

USITC Pub. 4085 at 16).  Domestic producers confirmed that they had additional capacity during

the period of investigation, and USW reported that domestic production increased after the

petitions were filed.  See id. at 58.  The record supported a finding that the domestic industry had

available capacity to produce and sell more PVLT tires.  ITG Voma and CRIA argue that

whatever available capacity the domestic industry had was insufficient to supply the total

increased demand for PVLT tires, see ITG Voma Rule 56.2 Br. 31–32; CRIA Rule 56.2 Br. 15–

22, but this does not undermine the Commission's finding that the domestic industry had unused

available capacity.

ITG Voma argues that the Commission cannot rely on its price effects analysis to support

its impact determination because the Commission found that subject imports did not depress or

suppress prices of the domestic like product to a significant degree.  See ITG Voma Rule 56.2

Br. 27–28.  ITG Voma's argument fails for two reasons.  First, ITG Voma's argument misstates

the Commission's findings.   In its price effects analysis, the Commission found that low-priced

subject imports undersold the domestic like product significantly and there was an overall

decline in domestic tire prices during the period of investigation, but there was insufficient

evidence in the record for the Commission to conclude that subject imports depressed or

suppressed prices.  This did not amount to a finding that subject imports did not depress or

suppress prices as ITG Voma claims.  Rather, the Commission was unable to make a finding

regarding price depression or suppression because it was unclear from the record whether it was

the underselling or the decline in raw material costs that was responsible for lowering the prices

of domestic tires.  Second, ITG Voma's argument presumes incorrectly that price depression or

suppression is required to find that imports have had an adverse effect on domestic prices.  The

statute directs the Commission to consider price effects by separately considering whether there

has been significant underselling and whether subject imports depressed or suppressed domestic

prices to a significant degree.  See 19 U.S.C. § 1677(7)(C)(ii).  Although there was insufficient

evidence in the record for the Commission to make a finding regarding price depression or

suppression, the Commission found that the low-priced subject imports significantly undersold

the domestic like product.  This underselling resulted in loss of shipments and market share for

domestic producers, even though domestic demand and consumption increased.  The

Commission concluded, therefore, that subject imports had an adverse effect on the price of

domestic tires because significant underselling by subject imports put competitive pressure on

the domestic industry.  The Commission was not required to find price depression or suppression

in order to find that subject imports adversely affected domestic prices.  See Grupo Ind. Camesa

v. United States, 85 F.3d 1577, 1582 (Fed. Cir. 1996); Cleo Inc. v. United States, 30 CIT 1380,

1396 (2006), aff'd, 501 F.3d 1291 (Fed. Cir. 2007).  The Commission's price effects analysis

supported its determination that subject imports adversely impacted the domestic industry.

      The court holds that the Commission's impact determination was supported by

substantial evidence.

### e.  The Commission's Causation Determination

      ITG Voma and CRIA argue that the Commission's causation determination was

unsupported by substantial evidence because any material injury incurred by the domestic

industry was not attributable to imports of PVLT tires from China.  See ITG Voma Rule 56.2 Br.

34–44; CRIA Rule 56.2 Br. 15–22, 36–44.  Defendant argues that it relied upon substantial

record evidence in determining that the domestic industry was materially injured by reason of subject imports.  See Def. Resp. Br. 36–43.

The Commission must determine whether the injury to the domestic industry was "by reason of" the subject imports.  See 19 U.S.C. § 1671d(b)(1), 1673d(b)(1).  Subject imports do not need to be the sole, principal, substantial, or significant cause of the material injury.  See Nippon Steel Corp. v. U.S. Int'l Trade Comm'n, 345 F.3d 1379, 1381 (Fed. Cir. 2003); S. Rep. No. 96–249, at 57, 74 (1979), reprinted in 1979 U.S.C.C.A.N. 381, 443, 460.  The causation element of the material injury analysis is satisfied "so long as the effects of [the subject imports] are not merely incidental, tangential, or trivial." Nippon Steel Corp., 458 F.3d at 1357 (citing Gerald Metals, 132 F.3d at 721–22).  The Commission is not required "to employ any particular methodology for determining whether this causation element has been met." See Bratsk Aluminum Smelter v. United States, 444 F.3d 1369, 1373 (Fed. Cir. 2006) (citing United States Steel Grp. v. United States, 96 F.3d 1352, 1361–62 (Fed. Cir. 1996)).  "The Commission is simply required to give full consideration to the causation issue and to provide a meaningful explanation of its conclusions." Mittal Steel Point Lisas Ltd. v. United States, 542 F.3d 867, 878 (Fed. Cir. 2008) (citing Bratsk, 444 F.3d at 1376).

The Commission found that there was a causal nexus between subject imports and the state of the domestic industry because subject imports were good substitutes for domestically-produced PVLT tires, the volume and increase in volume of subject imports were significant,[37]

---

[37] The Commission noted that information in the record suggested that the surge of subject imports following the expiration of the section 421 safeguard measure stymied the domestic industry's expansion efforts.  See Commission Views at 56 n.262.  The volume of subject

(footnote continued)

subject imports undersold the domestic like product at significant margins,[38] and competitive

low-priced PVLT tires from China put pricing pressure on tires throughout the market and

gained market share at the domestic industry's expense.[39]  See id. at 53–58.  The Commission

also found that the domestic industry had available capacity, and the surge of subject imports

prevented domestic producers from increasing production and selling more PVLT tires.  See id.

at 54–58.  For these reasons, the Commission concluded that, "because of subject imports, the

domestic industry had fewer shipments and consequently obtained lower revenues than it would

have otherwise had."  Id. at 58.

The Commission also considered whether factors other than subject imports had an

adverse impact on the domestic industry during the period of investigation, in order to ensure

that the Commission was not attributing injury from other factors to the subject imports.  See id.

at 58–60.  Demand and consumption did not adversely impact the domestic industry because

both increased during the period of investigation.  See id. at 58–59.  Production costs did not

adversely impact domestic producers because the cost of raw materials declined.  See id. at 59.

The Commission examined the role of non-subject imports, noting that Canada and Korea were

---

imports steadily increased until the antidumping and countervailing duty petitions were filed in
2014, at which point domestic producers were able to increase production, capacity expansion
plans, and new product launches.  See Commission Views at 57–58.

[38] As noted earlier in this opinion, the Commission found that "subject imports undersold the
domestic like product in 72 of 72 possible quarterly comparisons, or 100 percent of the time, at
margins reaching as high as [[      ]] percent and averaging [[      ]] percent."  Commission
Views at 46 (citing Staff Report at Tables V-5–V-10).

[39] Subject imports increased their share of the market from 11.5 percent in 2012 to 19.3 percent
in 2014, while domestic producers' market share declined from [[      ]] percent in 2012 to
[[      ]] percent in 2014.  See Commission Views at 42 n.198–99 (citing Staff Report at Table
C-2).

the two largest sources of PVLT tires from non-subject countries.  See id. at 59–60 (citing Staff

Report at Table IV-3).  Non-subject imports increased during the period of investigation, but

their share of the market declined.[40]  See id. (citing Staff Report at Table C-2).  Because non-

subject imports consisted predominantly of branded PVLT tires and were frequently priced

higher than subject imports, the Commission reasoned that the domestic industry's loss in market

share and reduced shipments were adverse effects caused by subject imports.  See id. at 59–60.

The Commission determined, therefore, that the domestic industry was materially injured by

reason of subject imports.  See id. at 60.  The court finds that substantial evidence in the record

supported the Commission's causation determination.

ITG Voma and CRIA claim that the Commission improperly analyzed whether imports

from non-subject countries caused the material injury.  See ITG Voma Rule 56.2 Br. 42–44;

CRIA Rule 56.2 Br. 39–44.  The court will affirm the Commission's causation determination if it

considered other potential causes of harm to the domestic industry and provided a reasonable

explanation that the harm was attributable to the imports under investigation.  See Mittal Steel,

542 F.3d at 878 (citing Bratsk, 444 F.3d at 1376).  The Commission considered factors other

than subject imports and reasonably explained that non-subject imports were not the cause of the

injury to the domestic industry because non-subject imports consisted of predominantly branded

tires, were frequently priced higher than subject imports, and lost market share during the period

of investigation.  See Commission Views at 59–60.  ITG Voma argues nonetheless that the

---

[40] PVLT tire imports from non-subject countries increased from 114.9 million tires in 2012 to
116.8 million tires in 2014, but their market share declined from 41.9 percent in 2012 to 38.8
percent in 2014.  See Commission Views at 60 n.273 (citing Staff Report at Table C-2).

record required the Commission to find that non-subject imports caused the alleged injury to the

domestic industry because the increased volume of non-subject imports matched the domestic

industry's decline in U.S. shipments over the period of investigation.  See ITG Voma Rule 56.2

Br. 43.  Without evidence of a causal nexus between the increased volume of non-subject

imports and the decline in the domestic industry's U.S. shipments, ITG Voma fails to

demonstrate that the Commission's determination was unsupported by substantial evidence.

CRIA argues that the absence of subject imports would have resulted in an increase of non-

subject imports rather than an increase in domestic production.  See CRIA Rule 56.2 Br. 39–44.

CRIA's argument implies that the Commission was required to explain why eliminating subject

imports would benefit the domestic industry and would not result in non-subject imports

replacing the role of subject imports in the market.  The Commission reasonably found, however,

that it was not required to engage in a counterfactual analysis in this case.  See Commission

Views at 38–40; see also Mittal Steel, 542 F.3d at 877–79 (clarifying the analysis required in

Bratsk); Bratsk, 444 F.3d at 1373 (explaining that a counterfactual analysis is required when

"commodity products are at issue and fairly traded, price competitive, non-subject imports are in

the market").  The Commission's analysis adequately addressed whether the material injury to

the domestic industry was attributable to imports from non-subject countries.

ITG Voma and CRIA may disagree with the Commission's weighing of the record

evidence, but are unable to show that the Commission's injury determination was unsupported

by substantial evidence.  Without a showing of a lack of substantial evidence, the court may not

reweigh the evidence and will not disturb the conclusion reached by the agency.  See Downhole

Pipe & Equip., L.P. v. United States, 776 F.3d 1369, 1377 (Fed. Cir. 2015) (quoting Trent Tube

Div., Crucible Materials Corp. v. Avesta Sandvik Tube AB, 975 F.2d 807, 815 (Fed. Cir. 1992)).

The court holds, therefore, that substantial evidence supported the Commission's determination

that the domestic industry was materially injured by reason of subject imports.

## CONCLUSION

For the foregoing reasons, the court concludes that: (1) the Commission did not deprive

ITG Voma of due process; (2) the Commission's findings regarding competition in the U.S.

PVLT tire market were supported by substantial evidence; (3) the Commission's volume

determination was supported by substantial evidence; (4) the Commission's impact

determination was supported by substantial evidence; and (5) the Commission's causation

determination was supported by substantial evidence.  Therefore, the court sustains the

Commission's final determination in all respects and denies the Rule 56.2 motions for judgment

on the agency record filed by ITG Voma and CRIA.

Judgement will be entered accordingly.


                                                    /s/ Jennifer Choe-Groves
                                                     Jennifer Choe-Groves, Judge


Dated:  July 28, 2017
        New York, New York